UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KENDRA M. OGLESBY, | CASE NO. 5:13CV61 |
| Plaintiff, | MAGISTRATE JUDGE GEORGE J. LIMBERT |
| v. | |
| CAROLYN W. COLVIN[1], ACTING COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM OPINION AND ORDER |
| Defendant. | |

Kendra M. Oglesby ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the Commissioner's decision is affirmed and Plaintiff's complaint is dismissed with prejudice:

## I.  PROCEDURAL AND FACTUAL HISTORY

On October 21, 2009, Plaintiff applied for SSI and DIB, alleging disability beginning January 1, 2006. ECF Dkt. #14 ("Tr.") at 91-95.[2] Plaintiff met the insured status requirements of the Social Security Act through March 31, 2011 ("DLI"). Tr. at 181. The SSA denied Plaintiff's applications initially and on reconsideration. Tr. at 136-141. Plaintiff requested an administrative hearing, which was held on April 18, 2011. Tr. at 47-80. At the hearing, the ALJ accepted the testimony of Plaintiff, who was represented by counsel, and Lynn Smith, a vocational expert ("V.E."). Following a psychological consultative examination, a supplemental hearing was held on

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2] References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

July 27, 2011. Tr. at 81-90. On August 5, 2011, the ALJ issued a Decision denying benefits. Tr. at 8-18. Plaintiff filed a request for review, which the Appeals Council denied on November 26, 2012. Tr. at 1.

On January 9, 2013, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On May 31, 2013, with leave of the Court, Plaintiff filed a brief on the merits. ECF Dkt. #18. On June 26, 2013, Defendant filed a brief on the merits. ECF Dkt. #19. A reply brief was filed on July 8, 2013. ECF Dkt. #20.

**II.**     **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was twenty-three years of age on the alleged onset date and twenty-eight years of age at the first hearing, suffered from attention deficit-hyperactivity disorder, borderline intellectual functioning, and an affective disorder, which qualified as severe impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c). Tr. at 21. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 404.1525, 404.1526, §416.920(d), 416.925 and 416.926 ("Listings"). Tr. at 11.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to the performance of work tasks that involve no more than three or four steps, take place in a work environment free from strict production standards or schedules, and which do not require the direction or supervision of others. Tr. at 12.

The ALJ ultimately concluded that Plaintiff could perform her past work as a file clerk, residential attendant, and sales clerk. Tr. at 17. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

**III.**     **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

-2-

    2.      An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

    3.      If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

    4.      If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

    5.      If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.   STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an

ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## V.     ANALYSIS

Plaintiff advances three arguments in this appeal. First, Plaintiff contends that the ALJ violated the treating physician's rule when he did not give controlling weight to the opinion of Scott Schmitt, M.D., who opined that Plaintiff could never complete a normal workday or workweek without interruptions from psychologically-based symptoms. Next, Plaintiff argues that the ALJ erred in giving little weight to the opinion of Julie Ainslie, LISW, LICDC, who treated Plaintiff for over a year and opined that Plaintiff could not perform full-time work.  Finally, Plaintiff asserts that the ALJ failed to met his burden at Step Five, insofar as he did not include limitations articulated by Ms. Ainslie in the RFC.  Although the ALJ provided a hypothetical to the V.E. that included Ms. Ainslie's conclusions regarding Plaintiff's limitations, he did not include Ms. Ainslie's conclusions in the RFC.

### A.     Medical evidence

When Plaintiff was twelve years of age, she underwent intelligence testing by way of the Wechsler Intelligence Scale for Children, which yielded a verbal scale score of 79, Performance Scale Score, 72, Full Scale Score of 73, Verbal Comprehension of 81,Perceptual Organization 70 and Freedom from Distractibility 75. The average on this test was 100 and the standard deviation was 15. Tr. at 357.

Plaintiff had assistance all through high school and when she was seventeen, the addendum to her Individualized Education  Program ("IEP") indicated that she had consistently performed below average on her aptitudes and achievement.  The addendum to her IEP reads, in pertinent part, "She demonstrates deficits in adaptive skills which will have an adverse effect on her ability to live independently." Tr. at 322.

Nevertheless, Plaintiff graduated from high school with a 2.705 grade-point average. Tr. at 282. Although she had an "adjusted curriculum," 75% of her academic schedule consisted of regular classes, in which she received a few A's, predominantly B's and C's, a few D's, and only one F. Tr.

at 282, 287. She was encouraged to get involved in regular activities as much as possible, Tr. at 292, and it was noted that she was, in fact, "involved in age appropriate activities" in high school.  Tr. at 288.

Plaintiff applied and was admitted to the University of Akron in 2010, She was a full-time student at the University during the fall of 2010, studying to be a medical assistant. Tr. at 703, 708, 713, 720, 833. Although she was placed on academic probation because of low grades and stopped attending classes, she indicated that she might try to return to the University to study communications. Tr. at 833.

Since reaching adulthood, Plaintiff's problems have been primarily emotional, with ongoing diagnoses of Major Depressive Disorder and Attention Deficit Hyperactivity Disorder.  The records from Portage Path Behavioral Health ("Portage Path") and from Coleman Behavioral Health ("Coleman") document problems with distractibility, loss of focus, anger, and easy frustration when she does not understand or is criticized.

Plaintiff treated at Portage Path for approximately eight months from October of 2009 through May of 2010.  Counseling notes over the eight-month period indicate Plaintiff had no more than mild to moderate symptoms related to familial and financial problems.  On October 20, 2009, Plaintiff was initially assigned a global assessment of functioning ("GAF") score of 54, indicating moderate functional impairment. Tr. at 512, 528.  An October 26, 2009 mental status examination report noted that Plaintiff had a euthymic mood, full affect, "adequate appearance," intact memory, "sufficient" attention, below average intelligence, and fair judgment. Tr. at 404.

Progress notes dated November 10, 2009 indicated that Plaintiff was smiling; cooperative; "fairly groomed;" had a bright mood/affect; spontaneous and normal speech; logical, coherent, and goal-directed thought; normal thought content; normal perception; no suicidal or homicidal ideation; intact cognition; and fair insight and judgment. Tr. at 388.

On February 8, 2010, H. Sharma, M.D., a psychiatrist at Portage Path, completed a Mental Status Questionnaire for the Bureau of Disability Determination. Dr. Sharma indicated that Plaintiff suffered from mild to moderate anxiety, had fair judgment, and had only mild limitations in her cognitive abilities.  He further opined that the remainder of Plaintiff's abilities were within normal

-5-

ranges. Tr. at 414-415. According to the Questionnaire, Plaintiff was first seen by Dr. Sharma on December 10, 2009 and then a second time on January 25, 2010 before he completed the Questionnaire. Tr. at 390-391, 416-417. Plaintiff saw Dr. Sharma again on February 15, 2010, March 11, 2010, and April 1, 2010, when Dr. Sharma adjusted Plaintiff's medication for depression. 482-483, 478-480, 502-503.

On March 10, 2010, Plaintiff discussed getting help looking for work from the state Department of Jobs and Family, from which she was also receiving cash assistance. She acknowledged difficulties raising her children and collecting childcare payments from their fathers. It was noted that although Plaintiff might need help to improve her parenting skills, although she was able to meet her basic needs. Tr. at 479. On May 4, 2010, Plaintiff discussed a bank overdraft and parenting classes. Tr. at 472.

Treatment notes from Coleman over four months from August to November 2010, maintained by Dr. Schmitt and Ms. Ainslie, show that Plaintiff was not experiencing any internal mental depression or anxiety, her mental status examinations were essentially unremarkable, and her primary stressors were family issues and her class work at the University of Akron. Tr. at 699-742. Ms. Ainslie noted improvement in Plaintiff's mood on September 16, 2010. Tr. at 725.

On September 16, 2010, Dr. Schmitt characterized Plaintiff's psychosocial and environmental problems as moderate and he assigned a GAF score of 49. Tr. at 722. In fact, mental status examinations on September 16, 2010, October 21, 2010, and November 11, 2010, were fully normal, with no deficits or abnormal signs. Plaintiff had full affect; improved mood; normal behavior, speech, demeanor, and appearance; and logical thought. Further, she had average intelligence; no impairments in memory, attention, or concentration; moderate depression; and moderate educational and economic problems. Tr. at 704-05, 709-10, 720-22. Similarly, at her November 16, 2010 appointment with Ms. Ainslie, Plaintiff reported improved mood and improved focus, which she attributed to her medication. Tr. at 699.

Dr. Schmitt completed a Medical Source Statement on February 25, 2011, in which he observed that Plaintiff's short term memory is limited and she is prone to distraction or forgetfulness. While Plaintiff's comprehension is normal, she has difficulty sustaining concentration and

-6-

persistence and has poor follow through. She becomes easily frustrated and oppositional towards authority figures. Tr. at 821. Dr. Schmitt further opined that Plaintiff would have difficulty more than twenty percent of the time with her ability to sustain concentration, to persist through assignments, and in her social interactions. He felt she could never complete a normal workday or workweek without interruptions from psychologically based symptoms.  Tr. at 819-820.

Ms. Ainslie also completed a Medical Source Statement (Mental) on March 31, 2011. She opined that Plaintiff was very distractible with a very short attention span. Ms. Ainslie further opined that Plaintiff lacks social skills needed to work around others without being a distraction to them. Tr. at 829. On July 8, 2011, Ms. Ainsley wrote a letter to Plaintiff's counsel, in which she opined that Plaintiff "has possibly the worst presentation of ADHD" Ms. Ainslie has seen. Tr. at 843. Ms. Ailslie further opined that Plaintiff "has a hard time understanding anything that involves more than one or two steps, and often fails to communicate clearly what her needs are." Tr. at 843. Ms. Ainslie wrote that Plaintiff had significant social deficits, that she angers easily, does not accept constructive criticism, has poor observation skills, and set unrealistic goals for herself, for instance, Plaintiff's desire to return to the University of Akron.

At the post-hearing consultative examination, E.M. Bard, Ph.D, concluded that Plaintiff had a mood disorder, NOS. In reviewing the record in this case, she observed that Plaintiff's school records were vague regarding Plaintiff's special education placement. Tr. at 834. Dr. Bard also reviewed a portion of Plaintiff's treatment notes from Portage Path.  Dr. Bard's assistant, Terry Bendo, administered an MMPI-2, however, Dr. Bard concluded that an invalid profile was generated. Tr. at 835.  Dr. Bard wrote, "[Plaintiff] exhibited significant elevation on the F-Scale which would indicate exaggeration of complaints and over-endorsement of symptoms that do not normally cluster together.  The F minus K index (F-K=24) is another indicator of the invalid profile generated by [Plaintiff].  The F minus K value is associated with individuals who are seeking to dramatize their distress and discomfort.  This also is an indicator associated with exaggerated psychopathology, also suggesting malingering." Tr. at 835. Even though Plaintiff told the examiner that she could not read, she read the first six questions aloud to the examiner and then completed the rest of the test. She did

ask to have several of the questions explained after she completed the test. Tr. at 835.Dr. Bard assigned a GAF score of 56.

Dr. Bard opined that Plaintiff was capable of performing multi-step tasks and simple tasks, based upon her ability to care for her children and herself each day. Dr. Bard further relied upon Plaintiff's activities of daily living, which included grocery shopping, taking her children to preschool, and visiting with her sister daily. Tr. at 836. Based upon Plaintiff's test results, Dr. Bard opined that her ability to perform multi-step tasks that require a higher level technical knowledge and advanced reasoning skills are compromised. It is important to note that Dr. Bard did not review the entire administrative record, for instance, Dr. Bard relied upon Plaintiff's statement that she received failing to below average grades in high school[3], when, in fact, Plaintiff's transcript reveals that she received mostly Bs and Cs in high school. Dr. Bard ultimately concluded that Plaintiff had mild limitations with respect to interaction with the public, supervisors, and coworkers, and moderate limitations with respect to responding to usual work situations and changes in a routine work setting. Tr. at 840.

### B. State Agency Assessments

On February 25, 2010, state agency psychologist David Dietz, Ph.D., reviewed the evidence in the record and determined that Plaintiff had no marked mental functional limitations, and had experienced no episodes of decompensation. Tr. at 430, 434. Dr. Dietz opined that Plaintiff was "capable of completing 3 to 4 step tasks that do not have strict production standards or schedules and did not require her to direct and supervise the behaviors of others." Tr. at 436. On June 8, 2010, state agency psychologist Karen Terry, Ph.D., reviewed the evidence in the record and affirmed Dr. Dietz's findings. Tr. at 531.

### C. Past Work

---

[3]Dr. Bard documented the fact that Plaintiff's educational history was not available for verification. Tr. at 836. Dr. Bard also questioned Plaintiff's veracity insofar as Plaintiff reported that she could not read, but read several test questions aloud to Mr. Bendo, and her reading comprehension skills tested in the normal range according to the 1994 school assessment.

Plaintiff's last reported job was in 2007 as a temporary file clerk at a nursing home, for approximately four months. Tr. at 70, 184, 191, 211, 281, 832. She was let go from that job in June 2007 when the "position was no longer needed." Tr. at 191, 211, 281, 832. Just prior to that job, she had worked as a cashier clerk at a grocery store for approximately three years. Tr. at 55,183-84, 191, 211, 281, 832. She quit that job "due to lack of money for bus transportation." Tr. at 56, 832. She also worked during 2004 and 2005 as a residential assistant at a nursing home for approximately twelve months. Tr. at 67-69, 191, 211, 281, 832. In the late 1990s, she worked as a retail sales clerk and stocker. Tr. at 67, 211.

Plaintiff reported that her past job duties included: cashiering, talking to customers, putting clothes away, answering phones, putting up displays, stocking, supervising cashiers, taking care of patients, doing laundry and dishes, checking patient records, filing, and sending faxes. Tr. at 211-16, 281. She has never been fired from a job, and gets along "fine" with authority figures. Tr. at 225, 246, 836. She has applied for other jobs since her last reported job.  Tr. at 71-72.

### D.     Hearing testimony

At the hearing, Plaintiff testified that she is "mentally incapable" of full-time employment. Tr. at 50.  She further testified that she suffers severe depression and anxiety.  She cries all the time, if she is not crying she is angry, and she gets frustrated very easily. Once or twice a week, Plaintiff does not want to get out of bed in the morning. Tr. at 53.  When Plaintiff gets nervous, she panics and her mind "blank[s]." Tr. at 52.  She has difficulty concentrating, she gets antsy and cannot sit for more than five or ten minutes at a time. Tr. at 53. Plaintiff experiences panic attacks, sometimes two or three a week, when she feels like she is being watched or pressured.  Tr. at 53.  When she experiences a panic attack, she "need[s] to like go out and breath or get a drink of water." Tr. at 53.

Plaintiff conceded that she is the primary care giver of her two young children, a son, age five and a daughter, age three, but explained that her mother and sister assist her by babysitting and preparing meals for her. Tr. at 51, 64. Plaintiff has a driver's license but does not drive "because of the medicine [she takes] and how angry and frustrated [she gets]." Tr. at 54.  At the time of the first hearing, she was prescribed Effexor XR, 75 mg. and Guanfacine, 1 mg.  She was also prescribed

asthma medication.  Although Plaintiff testified that her prescribed medication causes drowsiness, she also testified that she has difficulty sleeping.  Tr. at 54.

Plaintiff testified that she last worked at Marc's as a cashier in 2007.  Tr. at 55. She left after working at Marc's for three years because she "couldn't take it any more." Tr. at 55. She testified that people criticized and teased her, that she was "too slow," and she was "always getting yelled at." Tr. at 55. According to her testimony, Plaintiff was  "written up" on one occasion, for giving a customer the incorrect change, however, she explained that the manager counted her register and determined that she did not "short change" the  customer.  Tr. at 57.  Later in her testimony, she stated that her last job was a temporary file clerk position at a nursing home in 2007.  Tr. at 70.

Plaintiff's only means of support was welfare as of the date of the first hearing. Plaintiff testified that she had applied for three jobs since 2007.  Tr. at 72.  However, when she was reminded that applying for a certain number of jobs per week is a requirement of the welfare system, Plaintiff testified that she "had to go through an agency." Tr. at 72.  She further testified that she worked with Goodwill and "the job center." Tr. at 72.

At the hearing, the ALJ acknowledged that Plaintiff provided testimony that appeared contradictory, and as a result, the ALJ questioned Plaintiff's veracity.  Tr. at 58.  However, Plaintiff's counsel explained that Plaintiff had difficulty with concentration  and memory.  The ALJ and Plaintiff's counsel agreed that a psychological consultative examination would be appropriate, given Plaintiff's testimony at the hearing.  Tr. at 59.

At the second hearing, following the completion of the consultative examination performed by Dr. Bard, Plaintiff testified that her medication had been changed, she was prescribed Adderall for concentration and her Effexor was increased to 150 mg.  Tr. at 86.  Plaintiff further testified that the Mr. Bendo frustrated her during her testing because he "kept cracking his neck," which distracted her.  Tr. at 87.  She claimed that she asked him questions and he ignored her.

### E.     **The ALJ's Decision**

The ALJ relied upon the treatment notes from Portage Path and Coleman to establish that Plaintiff's examinations have, with few exceptions, yielded normal results.  Tr. at 13-14. The ALJ likewise relied upon the GAF scores assigned in the record, concluding that they reflected only

-10-

moderate impairments.  The ALJ cited *Smith v. Comm'r of Social Security*, 482 F.3d 873 (6th Cir.2007) for the proposition that "a GAF score of fifty is consistent with the ability to work." Finally, the ALJ cited Plaintiff's numerous activities of daily living, which he concluded, "strongly suggest that [Plaintiff] would be capable of engaging in work activity inherent in the residual functional capacity assessed herein."  Tr. at 14.

Next, the ALJ cited numerous inconsistencies in Plaintiff's testimony, which the ALJ concluded were cause to doubt Plaintiff's reliability, even assuming that the inconsistencies did not reveal a conscious intention by Plaintiff to deceive the ALJ.  Tr. at 14-15.  The ALJ also cited Plaintiff's demeanor at the hour-long hearing.  Although Plaintiff testified that she becomes "antsy" if she is required to sit for longer than five minutes, the ALJ observed that she did not demonstrate any difficulty sitting for a full hour during the hearing.  Tr. at 15.

The ALJ gave significant weight to the opinions of the agency physicians, insofar as they each had a opportunity to review the record and were reporting within the bounds of their respective professional certifications.  Tr. at 15.  The ALJ gave some weight to the opinion of Drs. Bard, Sharma, and Schmitt.  The ALJ assigned little weight to the opinion of Dr. Sharma, a treating physician,  because "evidence received subsequent to the rendering of [his] opinion as well as the presentation of [Plaintiff] at the hearing, justifies additional limitations being imposed."  Tr. at 16.

The ALJ accorded some weight to the opinion of Dr. Schmitt because Dr. Schmitt's opinion was inconsistent with his own treatment notes "in that the mental status examinations typically report a logical thought process, average intelligence, cooperative behavior, and no impairment of attention or concentration." Tr. at 16. The ALJ further opined that Dr. Schmitt's opinion was inconsistent with other opinions of record.  The ALJ gave little weight to Ms. Ainslie's opinion because it was inconsistent with most of the other opinions of record and she is a non-medical source.

### F.     Treating Physician Rule

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security.  Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians.  SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544.  A presumption exists that the opinion of

-11-

a treating physician is entitled to great deference. *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson v. Commisioner of Social Security,* 378 F.3d 541, 544 (6th Cir.2004) quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Commisioner of Social Security,* 486 F.3d 234, 243 (6th Cir.2007), citing *Wilson*, 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed

-12-

controlling. *Id.* citing  20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

In *Gayheart*, the Sixth Circuit recognized that conflicting substantial evidence must consist of "more than the medical opinions of the nontreating and nonexamining doctors." The Sixth Circuit reasoned that "[o]therwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion." *Gayheart* at 377. However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985).

Here, the ALJ clearly articulated his reasons for rejecting the opinion of Dr. Schmitt.  First, the ALJ concluded that Dr. Schmitt's opinion was contravened by his own treatment notes, which document, at the most, mild limitations in Plaintiff's ability to perform full-time work.  In fact, the treatment notes from Coleman document normal findings, with only mild exacerbation of Plaintiff's depression due to family stressors.

Of course, an ALJ may not give greater weight to the opinion of state agency physicians where the opinion of a treating physician regarding the nature and severity of a Plaintiff's condition is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.  However, in this case, the ALJ has clearly articulated his reason for giving little weight to the opinion of Dr. Schmitt, that is, Dr. Schmitt's dire conclusions regarding Plaintiff's limitations are not supported by his own treatment notes.  Insofar as the ALJ has concluded that substantial evidence in the record supports the conclusion of the state agency physicians regarding Plaintiffs' limitations, he has given greater weight to the opinions of Drs. Terry and Deitz.  State agency physicians are "highly qualified . . .experts in Social  Security disability evaluation."  20 C.F.R. § 404.1527(f)(2)(i), 416.927(f)(2)(i).  Accordingly, the ALJ did not violate the treating physician rule when he afforded little weight to the opinion of Dr. Schmitt.

### G.    Non-medical sources

Next, although Plaintiff concedes that Ms. Ainsley is a non-acceptable medical source, she nonetheless argues that the ALJ erred in according Ms. Ainslie's opinion little weight. According to Social Security Ruling 06-03p, 20 CFR 404.1527 and 416.927 do not explicitly address how to evaluate evidence, including opinions from "other sources" but do require consideration of such evidence when evaluating an "acceptable medical source's opinion." Social Security Ruling 06-03p reads, in pertinent part:

> Although the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources, "these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers . . . who have seen the individual in their professional capacity. These factors include:
>
> > How long the source has known and how frequently the source has seen the individual;
> >
> > How consistent the opinion is with other evidence;
> >
> > The degree to which the source presents relevant evidence to support an opinion;
> >
> > How well the source explains the opinion;
> >
> > Whether the source has a specialty or area of expertise related to the individual's impairment(s), and
> >
> > Any other factors that tend to support or refute the opinion.
>
> Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s) and physical and mental restrictions. . . .

Here, Ms. Ainslie's treatment notes, like Dr. Schmitt's treatment notes, document mild limitations: Mental status examinations result in typically normal results, Plaintiff is usually well-

groomed, with average demeanor, she is cooperative, with average eye contact and activity and clear speech. Although Plaintiff's mood is sometime described as labile and her behavior characterized as restless, the treatment notes suggest some stressor, typically a result of family problems or difficulty with classes at school. In fact, the treatment notes do not document any outbursts at school, despite the pressure she experienced there. Accordingly, the ALJ did not err in giving little weight to the conclusions of Ms. Ainslie.

Finally, having concluded that the ALJ did not err in according little weight to Ms. Ainsley's opinion, he likewise did not err when he did not include the limitations she described in the RFC. As a consequence, Plaintiff's third argument, predicated upon the ALJ's failure to include Ms. Ainsley's conclusions regarding Plaintiff's limitations in the RFC has no merit.

### **VI.    CONCLUSION**

For the foregoing reasons, the Commissioner's decision is AFFIRMED and Plaintiff's complaint is DISMISSED with prejudice.

DATE: March 21, 2013

                                              */s/George J. Limbert*
                                              GEORGE J. LIMBERT
                                              UNITED STATES MAGISTRATE JUDGE